Perl v Siegelbaum (2023 NY Slip Op 50818(U))

[*1]

Perl v Siegelbaum

2023 NY Slip Op 50818(U)

Decided on August 2, 2023

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 2, 2023
Supreme Court, New York County

Samuel Perl, Plaintiff,

against
Howard Siegelbaum, ANDREW BROOKER, ALEXANDER VITKALOV, CHAMBERS STREET CAPITAL MANAGEMENT, LLC, Defendant.

Index No. 652038/2021

Plaintiffs by: Romano Law PLLC, 55 Broad Street, 18th Floor, New York, NY 10004 
Defendants by: Kleinberg, Kaplan, Wolff & Cohen, P.C., 500 Fifth Avenue, New York, NY 10110

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 003) 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 76 were read on this motion to/for DISMISS..
Upon the foregoing documents, the branch of the motion to dismiss based on lack of personal jurisdiction is denied. Samuel Perl and Howard Siegelbaum began meeting in New York in 2017 at Mr. Siegelbaum's corporate offices where Mr. Siegelbaum and his colleagues solicited Mr. Perl to give up his current job and work for Mr. Siegelbaum's companies (NYSCEF Doc. No. 48; the AC). Mr. Siegelbaum's companies had their principal offices in New York at the time the relationship with Mr. Perl was formed. New York is where the parties negotiated and consummated their business relationships and where they agreed that Mr. Perl would go to work in Vietnam for Mr. Siegelbaum. The Chambers Agreement and the Subscription Agreement then provided for New York law and that any disputes arising from the agreements be litigated in New York, thereby reflecting the intent of the parties to center their relationship in New York where Mr. Siegelbaum's company had its principal offices and where the parties met. The torts alleged in the AC flow from the breaches of contract and representations made to Mr. Perl, all of which took place in New York. This all pre-dated Mr. Siegelbaum's purported relocation away from the jurisdiction of New York. (Although it would not change the outcome, it should be noted that Mr. Siegelbaum does not adduce documentary evidence indicating that he actually has established residence in Vietnam and that he is no longer a resident of New York [albeit after the fact for jurisdictional purposes]. The admissible evidence he adduces only indicates that as of October, 2021, he had obtained authorization to be in Vietnam until August, 2022.) Therefore, the branch of the motion seeking dismissal based on lack of personal jurisdiction is denied. The motion to dismiss also is denied as to the breach of fiduciary duty and shareholder oppression, tortious interference with economic advantage, defamation and slander, breach of contract, and fraud causes of action. 
As discussed below, the balance of the motion is granted solely to the extent that the tortious interference with contractual relations, and the breach of the covenant of good faith and fair dealing causes of action are dismissed.

 The Relevant Facts and Circumstances
The relationship and the agreements were forged at 200 Park Avenue. New York, NY
This is a case involving the failed relationship between Mr. Perl and Mr. Siegelbaum forged in 2017 at the New York City offices of Mr. Siegelbaum's company, Chambers Street Capital Management, LLC (Chambers). Chambers was formed in Delaware (id., ¶ 34). It is run out of New York where it has its principal place of business at 200 Park Avenue (id., ¶ 23). Mr. Siegelbaum is the Managing Member of Chambers and Andrew Brooker and Alexander Vitkalov are the Chief Financial Officer and Managing Director, respectively. Both Mr. Booker and Mr. Vitkalov are members of the Board of Directors of Chambers (id., ¶¶ 31-33). They also met with Mr. Perl in Chambers' principal place of business at 200 Park Avenue, New York, New York.
Chambers is the Investment Manager of Delphi Healthcare Holdings LP (Delphi). Delphi was formed in the Cayman Islands. Delphi's general partner is Mr. Siegelbaum's New [*2]York based company, Chamber Street Advisors, LLC (Mr. Siegelbaum's GP Entity). Mr. Siegelbaum was the initial limited partner (id., at ¶ 30). Delphi acquired Lab Group, a Vietnam based company (id., ¶¶ 28, 35). Mr. Perl was an investor in Delphi and the Chief Executive Officer (the CEO) of Lab Group until he resigned on October 19, 2020 (id., ¶¶ 27-28). Mr. Siegelbaum was the Chairman of Lab Group (id., ¶ 30). As set forth in the AC, Mr. Perl alleges that he was the CEO in name only despite promises to the contrary and that, in fact, it was really Mr. Siegelbaum who was running the show.
More specifically, among other things and as discussed below, Mr. Perl alleges that in New York, Mr. Siegelbaum and the other defendants lured him to leave his job at Gerson Lehman Group (GLG) to work for Mr. Siegelbaum and run Mr. Siegelbaum's strategic investments in Asia pursuant to the Chambers Agreement (hereinafter defined). Then, based on certain false promises, including that he would be the actual CEO of Lab Group, a Vietnam based company (and not just the CEO in name only) and that Mr. Siegelbaum would end Lab Group's illicit business practices of bribing officials, Mr. Siegelbaum induced him to invest in Delphi pursuant to a Subscription Agreement (hereinafter defined). Both the Chambers Agreement and the Subscription Agreement provide that the parties to those agreements consent to jurisdiction in New York, that New York law governs in the event of a dispute, and that all disputes arising under each such agreement are to be litigated exclusively in New York (NYSCEF Doc. No. 49, § 7[d]; NYSCEF Doc. No. 4, § B.1).
According to Mr. Perl, Mr. Siegelbaum also then breached or caused Chambers to breach their fiduciary duties to Delphi by, among other things, causing the hiring and retention of Mr. Siegelbaum's alleged unqualified biological brother for a lot of money. Finally, when Mr. Perl deigned to report these improprieties, Mr. Siegelbaum retaliated against him putting in place a plan to fire him and then, after he quit, defamed him both to Bain Capital (the very investor to whom Mr. Perl had reported Mr. Siegelbaum's misconduct) and to his potential future employer, Hoan My (resulting in Hoan My exercising its contractual right to terminate his employment during his probation period) by calling him a "traitor," "incompetent manager" and otherwise besmirching his reputation.
As discussed above, in 2016, Mr. Perl moved to New York and worked as an Account Executive at GLG as part of their North American financial coverage team specializing in hedge fund, private equity and venture capital primary research services working with over fifty investment funds in New York, Boston and across the United States (NYSCEF Doc. No. 48, ¶¶ 36-37).
While working for GLG, Mr. Perl met Messrs. Siegelbaum, Vitkalov and Brooker in New York when he sold investment research services to Chambers (id., ¶¶ 39-40). Subsequently, they continued to meet in New York at Chambers' Park Avenue offices to discuss Chambers' investment strategy, limited partners, investors, current and prospective global investments, introductions to co-investor private equity firms. Ultimately, Mr. Siegelbaum had Chambers retain Mr. Perl pursuant to a Letter Agreement (the Chambers Agreement; NYSCEF Doc. No. 49), dated November 29, 2017, by and between Mr. Perl and Chambers (NYSCEF Doc. No. 48, ¶¶ 41-43). Pursuant to the terms of the Chambers Agreement, the parties agreed [*3]that Mr. Perl would be focused on the management and operations of Mr. Siegelbaum's private investment in a Vietnamese operating company (i.e., Lab Group) and that he would be paid $72,000 per annum. In other words, the parties met in New York and negotiated in New York the business deal under which Mr. Perl would manage Mr. Siegelbaum's Lab Group investment. As noted above, the Chambers Agreement provides that it was to be governed by and construed in accordance with the laws of the State of New York, for consent to New York jurisdiction, and that New York was the exclusive forum to hear disputes arising out of the Chambers Agreement (id., at § 7[d]).[FN1]

In addition, pursuant to the terms of the Chambers Agreement, the parties agreed that certain provisions of the Chambers Agreement continued after termination of the Chambers Agreement. Significantly, one such provision was the Non-Disparagement / No Defamation provision:
5. Restrictive Covenants.
(f) Non-Disparagement. During your contract with the Company and thereafter without limitation of time, you shall not disparage or defame the Company, its affiliates or their current or former employees, officers, directors, shareholders, partners, members, advisors, other equity holders or managers (such shareholders, partners, members and other equity holders, the "Company Parties"), nor shall the Company Parties disparage or defame you, in each case in communications with investors, clients, potential clients, competitors, the media, or other persons with whom any of the above do business or may do business [FN2]
(id., at § 5[f]).
As contemplated by the Chambers Agreement, Mr. Siegelbaum then formed Delphi, a Cayman entity with a New York City based general partner, Mr. Siegelbaum's GP Entity and Chambers (who as discussed above has its principal offices located at 200 Park Avenue, New York), as its investment manager, to acquire a Vietnamese laboratory known as Lab Group (NYSCEF Doc. No. 48, ¶¶ 51-52). 
Although the Amended and Restated Limited Partnership Agreement of Delphi, dated February 14, 2019 (the Partnership Agreement) provides that Delphi is governed by Cayman law, pursuant to Section 10.10 of the Partnership Agreement, all of the partners indicated that, nonetheless, they consented to and submitted to the jurisdiction of the federal and state court of the State of New York and waived any objection to such jurisdiction:
10.10 Forum. TO THE FULLEST EXTENT PERMITTED BY LAW, IN THE EVENT OF ANY DISPUTE ARISING OUT OF THE TERMS AND CONDITIONS OF THIS AGREEMENT OR RELATING TO THE PARTNERSHIP, THE PARTIES HERETO CONSENT AND SUBMIT TO THE PERSONAL JURISDICTION AND VENUE OF THE FEDERAL AND STATE COURTS LOCATED IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK. ALL PARTNERS WAIVE ANY OBJECTION TO THE JURISDICTION OF SUCH COURTS AND TO THE PROPRIETY OR CONVENIENCE OF SUCH COURTS
(NYSCEF Doc. No. 5, § 10.10). 
Mr. Siegelbaum who then lived in New York and was Delphi's initial limited partner and principal (having executed the Partnership Agreement both in his individual capacity as its limited partner and also on behalf of Mr. Siegelbaum's GP Entity) raised money in New York through Butler Capital Partners, LP, a New York based broker-dealer (NYSCEF Doc. No. 48, ¶¶ 53-55). As relevant, the Court notes that the Partnership Agreement also provides that only the general partner, Mr. Siegelbaum's GP Entity, could bring suit on behalf of Delphi:
6.2 Specific Authority Granted to the General Partner. By way of extending the foregoing provisions, and not in limitation thereof, the General Partner shall, in its sole discretion and without the consent of the Partners, except as required by the Law, have the full right, power and authority, from time to time and at any time, on behalf of the Partnership, where applicable:
(k) To adjust, compromise, settle or refer to arbitration, any claim against or in favor of the Partnership or any nominee of the Partnership, and to institute, prosecute or defend any legal proceedings relating to the business and property of the Partnership
(NYSCEF Doc. No. 5, § 6.2[k]). 
According to the AC, while still full time in New York, Mr. Siegelbaum promised Mr. Perl that he would be the CEO of Lab Group and that he would be paid an annual salary and relocation expense to move to Ho Chi Minh City. On December 1, 2018 Mr. Siegelbaum also hired Mr. Perl as the Executive Director of CityLab Joint Stock Company (NYSCEF Doc. No. 48, ¶¶ 56-59). As part of his targeted fundraising activities in New York, Mr. Perl alleges that Mr. Siegelbaum continued to urge and solicit Mr. Perl to invest in Delphi. 
On February 15, 2019, five months before Mr. Siegelbaum indicates that he himself obtained work papers to work in Vietnam, Mr. Perl alleges that Mr. Siegelbaum promised that (i) he would have the same class of security and shareholder rights as Bain Capital Investors, (ii) Mr. Perl would not pay performance fees, (iii) Mr. Siegelbaum would clean up corruption and bribery issues relating to Lab Group payments to Vietnamese official and (iv) Mr. Perl would be the CEO. According to the AC, all of these promises were material to Mr. Perl's decision to invest in Delphi and all such promises were false (id., at ¶¶ 67-72, 83-88).
Mr. Perl alleges that based on these representations, on March 2, 2019, four months before Mr. Siegelbaum indicates that he moved to Vietnam (NYSCEF Doc. No. 31, ¶ 4), Mr. Perl executed the Subscription Agreement and the Partnership Agreement (NYSCEF Doc. No. [*4]48, ¶¶ 72-75). As discussed above, the Subscription Agreement indicates that any disputes arising out of or relating to the terms of the subscription agreement or the subscriber's investment shall be determined exclusively in the State or Federal courts located in the State and County of New York (NYSCEF Doc. No. 4, § B.1), The Subscription Agreement also provides that Mr. Perl is only relying on the information contained in the Agreement, the Limited Partnership Agreement and not on any representations made by the Investment Manager (id., § A.3). 
The Alleged Wrongful Conduct
According to the AC, Chambers consistently was in breach of the agreement by failing to timely pay Mr. Perl. In addressing the arears, in September, 2019, Chambers agreed to pay Mr. Perl $205,000 (NYSCEF Doc. No. 48, ¶¶ 89-91). Notwithstanding this agreement, Chambers still did not pay him at that time. In fact, it was not until March, 2020 that Mr. Siegelbaum authorized Chambers to pay Mr. Perl from their New York bank account at First Republic Bank (id., ¶¶ 91-92). According to the AC, Mr. Siegelbaum then falsely claimed to the New York based Delphi co-investors that Mr. Perl had agreed to reinvest in Delphi. According to Mr. Perl, this false representation caused him damages (id., ¶ 94).
Mr. Perl also alleges that Mr. Siegelbaum repeatedly used his positions as Managing Member of Chambers, founder and initial limited partner and principal of Delphi, and Executive Chairman of Lab Group in bad faith in order to advance his own interests to the detriment of those entities (id., ¶ 95). For example, in July of 2019, Mr. Siegelbaum came to Vietnam and, without (i) having any discussions with the boards of either Lab Group or Delphi and (ii) approval or legally required Vietnam work authorizations, began to formally run the operations of Lab Group thereby revoking Mr. Perl's authority as CEO (id., ¶¶ 112-115; NYSCEF Doc. No. 31, ¶ 4). In addition, while running Lab Group, Mr. Siegelbaum misappropriated Lab Group's resources to hire an investment analyst to support his New York hedge fund, Chambers Global Fund (NYSCEF Doc. No. 48, ¶ 117). Mr. Perl alleges that this conduct constituted a breach of fiduciary duty.
On October 15, 2019, without receiving the approval from Lab Group's or Delphi's board of directors, Mr. Siegelbaum hired his allegedly unqualified biological brother, John Westcroft, as an executive of Lab Group to procure a complex Laboratory Information System (LIS) and other various software and technology projects for Lab Group (id., ¶¶ 96-102). Mr. Siegelbaum admitted to Mr. Perl that Mr. Westcroft's mismanagement was damaging Lab Group and harming the Delphi shareholders. Nonetheless, he continued to cause Delphi to pay Mr. Westcroft excessive fees anyway:
103. Upon information and belief, Westcroft and Siegelbaum grossly mismanaged the LIS procurement, financially harming shareholders of Delphi.
104. Perl eventually confronted Siegelbaum after discovering that Siegelbaum had been in contact with Westcroft about duties assigned to him, and Siegelbaum admitted to some of the damage Westcroft caused as a result of Siegelbaum's improper hiring.
105. Siegelbaum admitted that Westcroft "held [Siegelbaum] hostage for a ton of [money]", that Westcroft was charging "excessive rates," and that Siegelbaum [*5]"consistently paid [Westcroft's excessive rates] despite the issues around it"; Westcroft's payment was "many times bigger than it should be"; and that Westcroft was "leeching off" the company.
106. Siegelbaum admitted to Perl that Westcroft was jeopardizing key business processes to extract more payments under Siegelbaum and Westcroft's secret arrangement
(id., ¶¶ 103-106). Mr. Perl alleges that Mr. Brooker facilitated these excessive fees and that Mr. Vitkalov was aware of these actions and failed to investigate or otherwise report them (id., ¶¶ 162-163). This too according to Mr. Perl constituted breaches of fiduciary duty.
On or about the end of 2019, Mr. Perl alleges that Hoan My, another Vietnamese company, approached Mr. Siegelbaum indicating interest in acquiring Lab Group (id., ¶ 110). According to Mr. Perl, Mr. Siegelbaum rejected Hoan My's inquiry without discussing it with the Lab Group board of directors (id., ¶ 111). Mr. Perl also alleges that this was a breach of fiduciary duty.
Mr. Perl Reports Mr. Siegelbaum's Misconduct
On May 19, 2020, Mr. Perl informed board members of Lab Group and Chambers and other Delphi shareholders of Mr. Siegelbaum's misconduct:
119. On May 19, 2020, after Perl realized Siegelbaum was hiding information from the boards of Lab Group and Delphi and failing to seek required board approvals, Perl informed board members and other shareholders of Defendant Siegelbaum's actions.
120. Perl informed Bernard Coquelet, the only other Lab Group board member, Ahmed El-Saifi, the independent director of Lab Group, Alexander Vitkalov, managing director of Chambers, and Andrew Brooker, CFO of Chambers.
121. On or between May 20 and May 25, 2020, Perl also brought Siegelbaum's misconduct to the attention of Colin Campbell, head of the Bain Capital team backing the Delphi investment, and Jared Perry, a member on the same Bain Capital team.
122. A day after Perl's call with the Bain Capital team, Campbell and Perry instructed Perl to bring his concerns to Siegelbaum directly.
123. That following day, Perl confronted Siegelbaum about his failure to disclose a buyer interested in acquiring Lab Group to the Delphi board
(id. at 119-123).
Mr. Siegelbaum Retaliates Against Mr. Perl
Sometime after Mr. Perl confronted Mr. Siegelbaum about his misconduct, Mr. Siegelbaum began slandering Mr. Perl to the Director of Chambers and to other co-investors of Delphi, accusing Mr. Perl of (i) being a "traitor," (ii) failing to meet imaginary investment commitments, and (iii) being an incompetent manager:
127. On June 2 and 3, 2020, Siegelbaum claimed on a WhatsApp message that Perl had a 'reciprocal commitment' to take the $205,000 he paid to Perl to satisfy Chambers' late salary payments and reinvest that payment back into Delphi. Attached hereto as Exhibit 6 [*6]is a true and correct copy of Mr. Perl's WhatsApp messages with Siegelbaum discussing Perl's 'reciprocal commitment.'
128. Siegelbaum previously never so much as proposed any such 'reciprocal commitment' agreement to Perl, let alone entered into any similar agreement with Perl, whether written or oral.
. . .
130. On June 3, Siegelbaum also informed Perl that he had discussed this false "commitment to reinvest" with Vitkalov, Chambers' Managing Director, at Chambers New York offices.

 131. Siegelbaum also informed Perl that he discussed the same imaginary "commitment to reinvest" with other Delphi co-investors, Ahmed El-Saifi and Calisto.
. . .
133. On or between June 23, 2020 and June 26, 2020, Bain Capital conducted a Risk Committee audit of Delphi through email and phone interviews with Siegelbaum, and also with Vitkalov in New York.
134. On information and belief, during interviews with the Bain Capital Risk Committee, both Siegelbaum and Vitkalov repeated the lies that Perl had failed to keep his Delphi investment commitments, was untrustworthy as a co-investor, and was an incompetent manager
(id., ¶¶ 127-128, 130-131, 133-134).
Mr. Perl alleges that these statements have damaged his otherwise positive reputation among Delphi shareholders and the New York-based investment community (id., ¶ 136).
On October 19, 2020, pursuant to a resignation letter sent to Mr. Siegelbaum and Mr. Vitkalov, Mr. Perl resigned as CEO of Lab Group (NYSCEF Doc. No. 55). Shortly thereafter, Mr. Perl negotiated a position as Head of Diagnosis Business at Hoan My (NYSCEF Doc. No. 48, ¶ 146) and signed an offer letter for a two-year employment with Hoan My (the Hoan Offer Letter NYSCEF Doc. No. 56). Pursuant to the Hoan Offer Letter, Mr. Perl's employment with Hoan My was subject to a 60 day probation period at the completion of which, the parties would sign a definite contract:
5. Probation: You will be on probation for a period of 60 days from your joining date. Upon successful completion of your probation and successful work permit granted by Vietnam Authority, the Company will sign a definite labor contract with the term of maximum the validation of working permit with you.
6. Termination: During the probationary period, the Company and you have the right to terminate the probation agreement without notice and without compensation if the probation as two parties' agreement are fail to perform. Upon your successful completion of probation and sign definite labor contract, your labour contract shall be termination according to Labor Code and the Company's internal regulation
(id., § 5-6).
Mr. Perl alleges that Mr. Siegelbaum, upon learning of this employment opportunity, contacted Hoan My's CEO and spread the same lies that he had told Chamber's board members and Delphi co-investors (NYSCEF Doc. No. 48, ¶ 151) and that as a result his employment with [*7]Hoan My was terminated (id., ¶¶ 152-154).
After all of this, Mr. Perl then sued. 
In this lawsuit, Mr. Perl alleges the Defendants breached their fiduciary duty (first cause of action) by (i) hiring Mr. Westcroft, Mr. Siegelbaum's brother, who was unqualified, without obtaining any conflicts clearance and without disclosing his relationship to Mr. Siegelbaum, (ii) facilitating payments to Mr. Westcroft, (iii) using Lab Group's resources to advance the interests of Mr. Siegelbaum's other hedge fund, and (iv) failing to investigate Mr. Siegelbaum's wrongful conduct. He also alleges that Mr. Siegelbaum tortiously interfered (second cause of action) with his contractual relations with (i) Chambers by causing Chambers to breach the non-disparagement clause, and (ii) the Hoan Offer Letter by disparaging him to Hoan My's CEO resulting in Hoan My terminating his employment.
He additionally alleges that Mr. Siegelbaum tortiously interfered with his economic interest (third cause of action) by purposely working to interfere with Mr. Perl's pending employment with Hoan My. In addition, he alleges that both Mr. Siegelbaum and Mr. Vitkalov defamed and slandered (fourth cause of action) him. According to Mr. Perl, Mr. Siegelbaum told Mr. Vitkalov who then told Delphi's co-investors that Mr. Perl (i) failed to keep a reinvestment promise (which promise he had never made), (ii) was a "traitor," and (iii) was an incompetent manager. He also alleges that Chambers breached the Chambers Agreement's non-disparagement clause (fifth cause of action) when Mr. Siegelbaum, as Chambers' Managing Member, disparaged him to the Hoan My CEO.
He also alleges that Chambers breached the covenant of good faith and fair dealing (sixth cause of action) when Chambers failed to investigate his claims that Mr. Siegelbaum was mismanaging Lab Group and when Mr. Siegelbaum revoked his authority as CEO of Lab Group.
Finally, he alleges that Chambers and Mr. Siegelbaum committed fraud (seventh cause of action) when they misled and induced him into investing in the Delphi Fund with promises of (i) being named CEO of Lab Group and managing its operations (when in fact he was not given the authority of CEO), (ii) hiring professional support for Lab Group, (iii) rectifying Lab Group's bribery issues, and (iv) giving him the same investor rights as Bain Capital.

 Discussion
On a motion to dismiss, the pleading is to be afforded a liberal construction, and the court is to accept the facts as alleged as true, accord the non-moving party the benefit of every favorable inference, and determine only whether the facts alleged fit any cognizable legal theory (Leon v Martinez, 84 NY2d 83, 87-88 [1994]).
I. This Court has personal jurisdiction over Mr. Siegelbaum
Mr. Siegelbaum argues that this Court lacks personal jurisdiction over him because he left New York and is no longer a resident and that the allegations set forth in the AC concern post-relocation conduct which neither subjects him to either general or long-arm jurisdiction. [*8]Stated differently, Mr. Siegelbaum argues that he has divested this Court of personal jurisdiction over him because he has moved out of the jurisdiction. According to him, it does not matter that he hired Mr. Perl in New York, caused his New York based entities to enter into agreements with Mr. Perl in New York while he himself was a New York resident, that the relevant written agreements contemplate (and indeed require) suit in New York and New York only and that he himself consented to jurisdiction in New York as a limited partner of Delphi pursuant to the Partnership Agreement. According to him, all that matters is that when he injured Mr. Perl — he did it when he was not in New York and when Mr. Perl was not in New York (which factual assertions as discussed above are also in dispute). As such, he argues that New York does not have jurisdiction over him and that the AC must be dismissed. The argument fails.
As an initial matter the Court notes that Mr. Siegelbaum has failed to establish that he is a non-resident of New York. In connection with his original motion to dismiss filed against the original complaint filed in this action (which this Court dismissed without prejudice), Mr. Siegelbaum alleged in his October 5, 2021 Affirmation (NYSCEF Doc. No. 31) that he left New York and became a full-time resident of Vietnam and that since July 2019, he has not maintained a residence in New York, worked in New York, and has only visited New York for a total of 36 days to visit his parents and undergo medical procedures:
2. I have been a full-time resident of Vietnam since early July 2019.
3. I have also worked in Vietnam as the Charmain of Lab Group International Vietnam Co., Ltd., a Vietnamese company, since early July 2019.
4. I do not own, rent or maintain any real property in New York and have not maintained a residence in New York since I left New York in July 2019.
5. Since I left New York over two years ago to assume employment in Ho Chi Minh City, I have only been present in New York twice. I visited my parents in New York City for the holidays over a six day period in December 2019. The only other time I was present in New York was for medical reasons when I underwent a series of surgical procedures in New York City and stayed in New York City for a total of 30 days in January and February 2020. My trips to New York were primarily for personal and medical reasons. The total amount of time that I spent in New York on both of those trips combined was 36 days.
6. While I am the co-managing member of Chambers Street Capital Management, LLC ("Chambers Street"), a New York entity, my employment obligations do not require me to be present in New York. Accordingly, I perform all of my business functions in Vietnam. I do not supervise any employees that are residents of New York
(NYSCEF Doc. No. 31, ¶¶ 2-6). In support of this assertion, he adduced a temporary resident card issued by the Republic of Vietnam which by its terms expired on August 15, 2022 (NYSCEF Doc. No. 34) and a work permit issued by the Republic of Vietnam which by its terms authorized him to work at Lab Group in Vietnamfrom December 03, 2020 until August 15, 2022 (NYSCEF Doc. No. 35).
However, these papers do not give Mr. Siegelbaum any authority to be in Vietnam after August 15, 2022 and no admissible evidence is presented to [*9]support this assertion after such date.[FN3]

Even if he has fled New York, this Court would still have jurisdiction over him. Putting aside that he consented to jurisdiction and waived objection to it when he executed the Partnership Agreement as Delphi's initial limited partner as discussed above (which consent and waiver ends the analysis), a court may exercise personal jurisdiction over a non-resident defendant who transacts business within the state if the defendant or commits a tortious act which causes injury to a person or property within the state (CPLR 302[a][1], [3]). A defendant who is not physically present in the state must have minimum contacts with the state, thereby availing itself of the protections and laws of that the state (Pramer S.C.A. v Abaplus Intl. Corp., 76 AD3d 89, 95 [1st Dept 2010]). As discussed above, this relationship was entirely forged in New York, contemplated out-of-state activity and the executed agreements that Mr. Siegelbaum did not sign in his individual capacity indicate that disputes arising from the agreements (including breach of the non-disparagement / no defamation provision of the Chambers Agreement) need to be litigated in New York.[FN4]
It does not matter that Mr. Siegelbaum was not a party to those other agreements. What matters is that the business deal that he negotiated was negotiated by him in New York and that this lawsuit between the parties stems from the fallout of those New York based agreements which require suit in New York. As such he is subject to jurisdiction and can not claim that New York is an inconvenient forum. Thus, the branch of the motion seeking dismissal based on lack of personal jurisdiction or forum non-convenience is denied.
II. The Breach of Fiduciary Duty Claim is not dismissed
The defendants next argue that the breach of fiduciary duty claim should be dismissed because Mr. Perl improperly asserts derivative and not direct claims (Dian Kui Su v Sing Ming Chao, 150 AD3d 424, 425 [1st Dept 2017]), that under the partnership agreement only Mr. Siegelbaum's GP Entity (which he controlled) could bring derivative claims and that no fiduciary duties were owed to Mr. Perl under Cayman Law. The arguments fail.
In determining whether a claim is direct or derivative, the relevant inquiry is whether the alleged losses caused by the defendant's breach affected the plaintiff differently than the business entity's other investors — i.e., whether the loss was disproportionately felt BML Properties Ltd. v China Const. America, Inc., 2019 WL 316718, * 9 [Sup Ct, NY County 2019], affd 174 AD3d 419 [1st Dept 2019], citing SFR Holdings Ltd. v Rice, 132 AD3d 424, 424 [1st Dept 2015]). As discussed above, Mr. Perl's claim is that Mr. Siegelbaum caused his companies to breach their [*10]fiduciary duties in Delphi by misappropriating funds from Lab Group to Mr. Siegelbaum's other hedge fund in New York. Although he was supposed to have the same rights and was supposed to be treated like Mr. Siegelbaum's other investors, Mr. Perl alleges that this was not the case and that he was disproportionately affected by this misappropriation because unlike other investors in Delphi, he held no interest in Mr. Siegelbaum's other hedge fund. As alleged, this is a direct not a derivative claim and dismissal of the breach of fiduciary duty claims is not appropriate.
Even were this claim styled as a derivative claim, Mr. Perl would have standing under Cayman law. The general rule under Cayman law is that a limited partner of an exempted limited partnership does not owe fiduciary duties in exercising its rights or performing its obligations under the partnership agreement to any other partner. Cayman Islands law follows the English common law rule set forth in Foss v Harbottle (2 Hare 461 [1843]) which recognizes the following four narrow exceptions to the general rule: (i) if the conduct infringed on the shareholder's personal rights, (ii) if the conduct would require a special majority to ratify, (iii) if the conduct qualifies as a fraud on the minority, or (iv) if the conduct consists of ultra vires acts (Renren, Inc. v XXX, 67 Misc 3d 1219(A), 2020 WL 2564684 at *24 [Sup Ct, NY County 2020], affd 192 AD3d 539 [1st Dept 2021]).
At issue is the "fraud on the minority" exception. To invoke this exception, the plaintiff must allege that the wrongdoers controlled a majority of the stock with voting rights and that those wrongdoers committed fraud (id.). As the English Court of Appeal has observed, the relevant inquiry with respect to the element of control is whether the alleged wrongdoers have the power to block the company from bringing a claim against them (Barrett v Duckett, [1995] 1 BCLC 243, 249i-250a). The element of fraud may be established where the wrongdoers committed a deliberate and dishonest breach of duty, or where the wrongdoers derived a personal benefit at the expense of the company's shareholders (Renren, Inc., 67 Misc 3d 1219(A), 2020 WL 2564684 at *24). 
Both the control and fraud requirements are satisfied by the well pled complaint. As discussed above, Delphi's Partnership Agreement provides that suits must be brought by Mr. Siegelbaum's GP Entity, which Mr. Siegelbaum controlled (NYSCEF Doc. No. 5, § 6.2[k]). As such, Mr. Siegelbaum could block the company from bringing suit against him. As discussed above, the allegations in this case include, among other things, that Mr. Siegelbaum misappropriated Delphi company assets to support his New York hedge fund and that he used his position to pay excessive fees to his unqualified biological brother. As alleged, this is a deliberate and dishonest breach of duty at the expense of the company's shareholders. This is sufficient to allege that the fraud on the minority exception applies at this stage of the litigation and thus the motion must be denied.[FN5]

III. Mr. Perl's tortious interference with contract claim is dismissed
To plead tortious interference of contract, a plaintiff must allege (i) the existence of a valid contract between plaintiff and a third party, (ii) the defendant's knowledge of that contract, (iii) the defendant's intentional procuring of the breach, and (iv) damages (Foster v. Churchill, 87 NY2d 744, 750 [1996]). As discussed above, Hoan My did not breach the Hoan Offer Letter. They simply exercised their right to terminate his employment during the 60-day probation period. The claim also is not properly asserted against Chambers based on Chambers' alleged interference with the Chambers Agreement (Bradbury v Israel, 204 AD3d 563, 564 [1st Dept 2022]). Accordingly, this cause of action is dismissed.
IV. Mr. Perl's tortious interference with economic advantage claim is not dismissed
Tortious interference with prospective economic advantage requires interference accomplished by "wrongful means" or that the defendant acted for the sole purpose of harming the plaintiff (Snyder v Sony Music Entertainment, Inc., 252 AD2d 294, 299-300 [1st Dept 1999]). In the AC, Mr. Perl alleges that Mr. Siegelbaum interfered with the Hoan Offer Letter by slandering him to Hoan My's CEO solely to retaliate against him and without proper purpose following the prior advance by Hoan My that Mr. Perl alleges that Mr. Siegelbaum improperly ignored. This is sufficient and the motion is therefore denied.
V. Mr. Perl's defamation and slander claim against Mr. Siegelbaum and Mr. Vitkalov is not dismissed
Messrs. Siegelbaum and Vitkalov argue that the statements made to Delphi co-investors regarding Mr. Perl are not actionable as defamation and slander because they are too vague and subjective to be considered anything more than their opinions. The argument fails. 
In determining whether statements are actionable as defamatory, courts consider: (i) whether the specific language in issue has a precise meaning which is readily understood, (ii) whether the statements are capable of being proven true or false, and (iii) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal listeners that what is being heard is likely to be opinion or fact (Frecthman v Gutterman, 115 AD3d 102, 105 [1st Dept 2014]). As alleged in the AC, Mr. Siegelbaum and Mr. Vitkalov made very specific malicious false statements including calling him an "incompetent manager" to Delphi co-investors and to Mr. Perl's prospective employer. These allegations satisfy CPLR 3016(b) and are actionable.
VI. Mr. Perl's breach of contract claim against Chambers is not dismissed
The elements of a claim sounding in breach of contract are (i) the existence of a contract, (ii) the plaintiff's performance, (iii) the defendant's breach, and (iv) resulting damages (Alloy Advisory, LLC v 503 W. 33rd St. Assocs. Inc., 195 AD3d 436, 436 [1st Dept 2021]). When parties expressly intend to supersede the terms of a prior agreement, the prior agreement is a legal nullity (Options Group, Inc. v Vyas, 91 AD3d 446, 447 [1st Dept 2012]). Mr. Siegelbaum argues that dismissal is appropriate because the parties expressly agreed that the Chambers Agreement would be superseded and that the Chambers Agreement would be terminated at such time as a subsequent agreement was executed with Lab Group. The argument fails. Putting aside Mr. Perl's technical argument that no further offer letter was executed with Chambers as contemplated by the Chambers Agreement, pursuant to Section 5(f) of the Chambers Agreement, the parties agreed that the non-disparagement / no defamation provision of the agreement would continue "without limitation of time." Put another way, by the express terms of the Chambers Agreement this obligation was not superseded, and this cause of action is not ripe for dismissal.
VII. Mr. Perl's breach of covenant of good faith and fair dealing claim against Chambers is dismissed
Breach of the covenant of good faith and fair dealing occurs when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement (Gettinger Associates, L.P. v Abraham Kamber Co. LLC, 83 AD3d 412, 413 [1st Dept 2011]). As discussed above, although Mr. Siegelbaum caused Lab Group to retain Mr. Perl as CEO pursuant to the Employment Agreement, the Employment Agreement is between Mr. Perl and Lab Group  not Chambers. The Chambers Agreement contemplated that Mr. Perl would be retained pursuant to an agreement with Lab Group (which he was) and upon the execution of such agreement the Chambers Agreement was terminated. The allegations here are that Mr. Siegelbaum made Mr. Perl CEO in name only and deprived Mr. Perl of the benefit of the bargain by making himself the de facto CEO, hiring his unqualified brother and paying him substantial fees and otherwise making the decision to, and causing the diversion of, Lab Group's capital and resources to his own hedge fund in New York. Although potentially actionable, Chambers is not the proper defendant to this cause of action. As such, the motion must be granted.
VIII. Mr. Perl's fraud claim against Chambers is not dismissed
Fraud requires (i) a material representation of a fact, (ii) knowledge of its falsity, (iii) an intent to induce reliance, (iv) justifiable reliance by the plaintiff, and (iv) damages (Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]). When the parties agree that they are only relying on statements made in the agreement in which they are entering, they cannot, by law, justifiably rely on statements made outside of the agreement so long as the agreement contains a specific disclaimer of responsibility for extraneous representations (Avnet, Inc. v Deloitte Consulting LLP, 187 AD3d 430, 432 [1st Dept 2020]; cf. Basis Yield v Goldman Sachs Group, Inc., 115 AD3d 128, 137 [1st Dept 2014]). Even if the disclaimers and disclosures are to be viewed as sufficiently specific, a plaintiff may not be precluded from claiming reliance on misrepresentations of facts peculiarly within the defendant's knowledge (Basis Yield, 115 AD3d at 140).
Relying on Avnet, Mr. Siegelbaum argues that dismissal is appropriate because Mr. Perl expressly acknowledged that he was not relying on any statements outside of the agreements he executed. The argument fails. In Avnet, the plaintiffs invested in a company based on promises that the company was fundamentally sound and that its consultants could fix certain problems in short order. The agreement at issue provided however that parties executing the agreement did not rely on written or oral representations made outside of the four corners of the agreement. The trial court dismissed the fraudulent inducement claim as not actionable because it was based on the combination of (i) a future promise and (ii) an opinion without basis in fact (Avnet, Inc. v Deloitte Consulting LLP, 2019 WL 5098772 [Sup Ct NY County 2019], affd Avnet, Inc. v Deloitte Consulting LLP, 187 AD3d 430, 432 [1st Dept 2020]). This is not Avnet.
As discussed above, Mr. Perl alleges that Mr. Siegelbaum defrauded him when he told him that he would have the same rights and be treated like other investors in Delphi. These facts were within Mr. Siegelbaum's peculiar knowledge and as alleged they were false. This is sufficient at this stage of the litigation and the claim is not dismissed (see Basis Yield, 115 AD3d at 140).
It is hereby ORDERED that the branch of the motion seeking to dismiss all claims as against Mr. Siegelbaum is denied; and it is further
ORDERED that the motion to dismiss is otherwise granted solely to extent of dismissing the causes of action sounding in tortious interference with contractual relations, and the covenant of good faith and fair dealing; and it is further
ORDERED that the defendants shall file an answer within 20 days of the date of this decision and order and a preliminary conference is scheduled for August 30, 2023 
@ 11:30 am.
8/2/2023
ANDREW BORROK, J.S.C.

Footnotes

Footnote 1:Although the terms of the Chambers Agreement provide that the agreement would be superseded by a further offer letter with Chambers and also that there would be an employment contract with VNLab (NYSCEF Doc. No. 49, §§ 1[c], 2[a]), no further offer letter with Chambers was in fact executed. Subsequently, Mr. Perl did enter into an Employment Contract (the Employment Agreement; NYSCEF Doc. No. 6) dated March 28, 2019 with Lab Grouppursuant to which Mr. Perl was named CEO of Lab Group.

Footnote 2:Mr. Siegelbaum was the managing member of Chambers and as such is included in the definition of Company Parties. (NYSCEF Doc. No. 12, ¶ 6).

Footnote 3:Although Mr. Siegelbaum's original affidavit, dated October 5, 2021 (NYSCEF Doc. No. 31) was executed and notarized in Ho Chi Minh City, he has not submitted any additional admissible evidence in support of this assertion. To wit, his other "affirmations" are inadmissible hearsay because they have not been notarized at a US embassy or consulate or otherwise.

Footnote 4:For completeness, the Court notes that parties expressly agreed that any claim grounded in defamation would be heard in New York, the Court has jurisdiction over this claim and Mr. Siegelbaum's argument that jurisdiction can not be based solely on defamation fails (Brooke Group v JCH Syndicate 488, 87 NY2d 530, 534 [1996]).

Footnote 5:For completeness, although no separate motion was brought by either Mr. Brooker or Mr. Vitkalov, the Court notes that Cayman law requires that third parties either directly participate in or be an accessory to the conduct which constituted the alleged breach of duty (Renren, Inc., 67 Misc 3d 1219(A), 2020 WL 2564684 at *29). Mr. Perl alleges that (i) Mr. Brooker assisted in Mr. Siegelbaum's breach by facilitating the excessive payments to Mr. Westcroft and (ii) Mr. Vitkalov assisted because he knew of Mr. Siegelbaum's wrongful conduct and failed to investigate or otherwise report the conduct to other Delphi investor or any board members of Delphi or Lab Group (NYSCEF Doc. No. 48, ¶¶ 162-163). This too is sufficient.